

FILED

Jan 09 2020, 8:04 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Matthew J. McGovern
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caroline G. Templeton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Paris Cornell,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

January 9, 2020

Court of Appeals Case No.
19A-CR-1101

Appeal from the Vanderburgh
Circuit Court

The Honorable Kelli E. Fink,
Magistrate

Trial Court Cause No.
82C01-1808-MR-5903

**Baker, Judge.**

[1] Paris Cornell appeals his convictions and sentence for Felony Murder[1] and Level 3 Felony Conspiracy to Commit Armed Robbery.[2] Cornell was fifteen years old at the time of the offenses, but was tried and convicted as an adult. On appeal, Cornell argues the following: (1) he was denied equal protection under the Fourteenth Amendment when the trial court allowed the State to strike one of only two Black jurors; (2) the trial court erroneously admitted inadmissible hearsay evidence; (3) the erroneous admission of hearsay evidence violated his rights under the Confrontation Clause of the Sixth Amendment; and (4) his sentence was inappropriate in light of the nature of the offenses and his character. Finding no error and that the sentence was not inappropriate, we affirm.

## Facts

[2] At around 4:00 AM on July 18, 2018, brothers Joan and Kevin Colon went to Sam's Food Market in Evansville. When they arrived, Joan went inside to buy cigarettes and gas and Kevin remained outside; Kevin had joined his brother on the trip to Sam's hoping to meet someone to buy marijuana.

[3] A few minutes before Joan and Kevin arrived at Sam's, Denyae Burris, Jacorion Madison, Jahkei Mitchell, and Cornell, four friends and teenagers, also went to Sam's. The four went inside to buy some food and then exited the

---

[1] Ind. Code § 35-42-1-1(1).

[2] I.C. § 35-42-5-1(a)(2).

store. As they exited, Keyovie Sargent (Jacorion's cousin, known as "Biggie") drove up to the store in a red car with Kyavion Brown, another teenager, in the passenger seat. Kevin, who was intoxicated at the time, approached Biggie's car with a twenty-dollar bill, hoping to buy some marijuana from Biggie and Kyavion. Meanwhile, Cornell and Jahkei walked around the corner of the building, out of view of any surveillance cameras, and then walked back around to Biggie's car.[3] Cornell then spoke briefly with Biggie before going back around the side of the building again with Jahkei, this time bringing Kevin along with them.

[4] Soon after Cornell, Jahkei, and Kevin went together to the side of Sam's, Kyavion, still sitting in Biggie's passenger seat, heard someone say "b*tch," tr. vol. III p. 4; immediately afterward, both Jacorion and Kyavion heard a gunshot. After hearing the gunshot, Jacorion and Denyae got into Biggie's car, and the group drove away.

[5] When Joan eventually exited the store, he looked around for Kevin but could not find him anywhere. Thinking Kevin may have started walking back home, Joan got in his car and left Sam's, but when he didn't see Kevin anywhere along the route, he drove back to Sam's. He eventually found Kevin collapsed

---

[3] The State alleges that it was at this moment—when Cornell and Jahkei walked to the side of the building— that Jahkei gave the gun to Cornell. Security footage showed that before Cornell walked around to the side of the building, he never touched his pocket, but that "the second that he comes back around from that corner, his hand never let [sic] his pocket, even when he spoke with everybody at the car and continued back to the other side." Tr. Vol. III p. 91. The trial testimony of Detective King, in which he recounts statements made to him by Denyae, also supports this conclusion. *See id.* at 157-58.

on the ground, unresponsive, on the side of the building. Joan called his other brother, who told him to call 911. The clerk working at Sam's ended up calling 911. When police and EMTs arrived, the EMTs determined that Kevin had been shot in the upper chest. He was then taken to the hospital around 4:29 AM, and he was pronounced dead at 4:41 AM. The autopsy conducted later that day confirmed that death was a result of a gunshot wound to the heart and that death would have occurred within a few seconds to a few minutes of the shot being fired.

[6] Jacorion testified that he had seen Jahkei with a black handgun earlier that day at Denyae's house, and that he saw Jahkei with the gun again after the incident when he, Denyae, Jahkei, and Cornell returned to Denyae's house. At some point afterward, Jahkei went to his cousin's mother's house, after which his cousin "found" a gun at the house and disposed of it in the Ohio River. Tr. Vol. II p. 191. He claimed he disposed of the weapon because he felt "it was disrespectful" to have the gun at this mother's house. *Id.* at 191, 193.

[7] Law enforcement recovered a .40-caliber Geco shell case from the Sam's parking lot. During a search of Cornell's bedroom, police recovered an unfired round of .40-caliber Smith and Wesson ammunition, a bullet box, a taser, one banana-style .22-caliber magazine, a .22-caliber bullet, and a .380-caliber bullet, as well as clothing and sandals that matched what Cornell wore the morning of the shooting. Police also located a fake plastic handgun in a kitchen cabinet in Cornell's home.

[8] On August 29, 2018, the juvenile court waived jurisdiction of Cornell on the basis that he committed the alleged offense of murder when he was a child between twelve and sixteen years of age.[4] The next day, the State charged Cornell as an adult with two counts of felony murder, one count of Level 3 felony attempted armed robbery, and one count of Level 3 felony conspiracy to commit armed robbery. The State also alleged that Cornell committed the charged offenses while using a firearm, thus making him eligible for the firearm sentencing enhancement.[5]

[9] A jury trial was held from March 18, 2019, to March 20, 2019. During voir dire, three prospective jurors were struck peremptorily. The first, Ms. S., testified that when her son was nineteen, he had been convicted of possession of paraphernalia and criminal mischief, and that her father had been robbed twice when she was a teenager. She stated that she "may not have an open mind about this case" and that she "may not be" a fair juror. Tr. Vol. II p. 26. The second struck juror, Ms. H., testified that she had been prosecuted in 2006 for visiting a common nuisance but was treated fairly, and that she would be fair and impartial in this case.

[10] The third prospective juror that the State struck, Mr. M., testified that he pleaded guilty in 2017 to charges related to the battering of his son, who was

---

[4] Ind. Code § 31-30-3-4.

[5] Ind. Code § 35-50-2-11.

seventeen years old at the time, after his son told him that his girlfriend was pregnant. Mr. M. agreed that it was something he "really regret[s]," but that he nonetheless felt the process was fair and testified that he would not hold anything against the State as a result of that prosecution. Mr. M. was one of two Black people on the jury panel. Cornell raised a *Batson*[6] objection at the time the State exercised the peremptory challenge against Mr. M. and the trial court overruled it, finding that there was no discrimination. At the conclusion of the trial, the jury found Cornell guilty as charged on all counts and found that the firearm enhancement applied.

[11]　At a sentencing hearing on April 15, 2019, the trial court merged the two murder convictions and merged the attempted robbery count with the conspiracy count, entering judgment of conviction only on the murder and conspiracy to commit armed robbery verdicts. The trial court sentenced Cornell to fifty-two years for murder and seven years for conspiracy to commit armed robbery, to be served concurrently. Due to the firearm sentencing enhancement, the trial court enhanced the murder sentence by ten years, for an aggregate term of sixty-two years, to be served in the Department of Correction. Cornell now appeals.

---

[6] *Batson v. Kentucky*, 476 U.S. 79 (1986)

# Discussion and Decision

## I. *Batson*

[12]   Cornell first argues that the trial court erred by allowing the State to peremptorily strike one of only two Black people from the jury panel, thereby violating Cornell's equal protection rights under the Fourteenth Amendment to the U.S. Constitution.

[13]   In *Batson v. Kentucky*, the United States Supreme Court held that a State's exercise of a peremptory challenge is subject to the Equal Protection Clause, which "forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." 476 U.S. 79, 89 (1986). "Purposeful racial discrimination in selection of the venire violates a defendant's rights to equal protection because it denies him the protection that a trial by jury is intended to secure." *Id.* at 86.

[14]   Our Supreme Court has explained the required burden-shifting analysis for a *Batson* challenge as follows:

> The *Batson* Court developed a three-step test to determine whether a peremptory challenge has been used improperly to disqualify a potential juror on the basis of race. First, the party contesting the peremptory challenge must make a prima facie showing of discrimination on the basis of race. Second, after the contesting party makes a prima facie showing of discrimination, the burden shifts to the party exercising its peremptory challenge to present a race-neutral explanation for using the challenge. Third, if a race-neutral explanation is proffered, the trial court

must then decide whether the challenger has carried its burden of proving purposeful discrimination.

*Jeter v. State*, 888 N.E.2d 1257, 1263 (Ind. 2008) (internal citations omitted). The decision of the trial court regarding whether a peremptory challenge is discriminatory is accorded great deference on appeal and will be set aside only if it is clearly erroneous. *Forrest v. State*, 757 N.E.2d 1003, 1004 (Ind. 2001).

[15] During voir dire, the State used one of its peremptory challenges to strike Mr. M., one of only two Black people, from the panel of potential jurors. Cornell made a *Batson* challenge, stating that "the record would show that Mr. [M.] is only one of two African American's [sic] on this whole panel. He's the only one in this configuration, and [Cornell] is African American as well." Tr. Vol. II p. 60. In response, the State offered the following reason for striking Mr. M.:

> THE STATE: . . . [H]is questionnaire outlines that he was convicted of a crime with his 19-year-old son as the victim, and I discussed that with him, and essentially his, he plead guilty to all of that and the State's reason for striking him is the similarities between [Cornell's] age and his son and the sympathy that people make mistakes and the State would feel that based on that episode and the circumstances where Mr. McIntosh says that his son got someone pregnant and made a mistake, the State believes that the age of [Cornell] and our case would strike too close at home to his son's and the regret for him having battered his son. So, that is the reason why the State is striking him.

*Id.* at 60-61. The trial court overruled Cornell's *Batson* challenge, reasoning that "we have two African Americans on the jury panel," and that therefore "[w]e have at least someone else who might be eligible, so I am not going to find

evidence of discrimination." *Id.* at 61. The trial court concluded that the State's reason for striking the juror was race neutral.

[16] Under the first step of the *Batson* analysis, Cornell argues that the striking of one of only two Black people on the jury panel shows prima facie discrimination. "A prima facie showing requires the defendant to show that peremptory challenges were used to remove members of a cognizable racial group from the jury pool and that the facts and circumstances raise an inference that the removal was because of race." *Hardister v. State*, 849 N.E.2d 563, 576 (Ind. 2006). The removal of the only Black juror from a panel is sufficient to establish prima facie discrimination under *Batson*. *Cartwright v. State*, 962 N.E.2d 1217, 1222 (Ind. 2012). On the other hand, "[t]he removal of some African American jurors by the use of peremptory challenges does not, by itself, raise an inference of racial discrimination." *Highler v. State*, 854 N.E.2d 823, 827 (Ind. 2006).

[17] Cornell acknowledges that the removal of some, but not all, Black jurors via peremptory challenges does not create a prima facie case of discrimination. Instead, he centers his argument on the following language from *Batson*:

> We have observed that under some circumstances proof of discriminatory impact "may for all practical purposes demonstrate unconstitutionality because in various circumstances the discrimination is very difficult to explain on nonracial grounds." For example, "total or seriously *disproportionate exclusion* of [Black people] from jury venires," [] "is itself such an 'unequal application of the law . . . as to show intentional discrimination.'"

*Batson*, 476 U.S. at 93 (emphasis added) (quoting *Washington v. Davis*, 426 U.S. 229, 241 (1976) (internal quotations omitted)) (internal citations omitted). Cornell contends that the removal of one of two Black jurors from the jury panel constitutes the type of "disproportionate" exclusion contemplated by *Batson* and thus makes for a prima facie case of discrimination.

[18] We disagree. In *Hardister v. State*, our Supreme Court found no prima facie discrimination where the State exercised five of six peremptory challenges to strike potential Black jurors from the panel, which left only two remaining Black jurors, one of whom was struck by the defense. 849 N.E.2d at 576. If striking six of seven total Black jurors from the panel was not sufficient to create a prima facie case of discrimination, then we would be hard pressed to find prima facie discrimination in Cornell's case.

[19] Even if Cornell had successfully showed prima facie discrimination, we nonetheless find that the explanation offered by the State for striking Mr. M. was race neutral, and that the trial court was within its discretion in concluding that Cornell had not carried the burden of showing purposeful discrimination by the State. "If the explanation, on its face, is based on something other than race, the explanation will be deemed race-neutral." *Forrest*, 757 N.E.2d at 1004. The State's proffered explanation for striking Mr. M. was based on Mr. M.'s previous involvement with the criminal justice system, and for the similarity in age between his own son and Cornell. Taken at face value, this is a sufficiently race-neutral explanation for striking Mr. M.

[20] As for the third and final step of the *Batson* analysis, our inquiry is as follows:

> Although the ultimate burden of persuasion regarding purposeful discrimination rests with the party opposing the strike, "This final step involves evaluating the persuasiveness of the justification proffered by the [proponent of the strike]. . . ." *Rice v. Collins*, 546 U.S. 333, 338, 126 S. Ct. 969, 163 L.Ed.2d 824 (2006). This point was amplified in *Hernandez* [*v. New York*, 500 U.S. 352 (1991)]. "In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the [proponent's] state of mind based on demeanor and credibility lies peculiarly within a trial judge's province."

*Jeter*, 888 N.E.2d at 1264-65 (some internal citations and quotations omitted).

[21] We find no evidence undermining the demeanor and credibility of the State when it offered its race-neutral explanation for striking Mr. M. As such, the trial court did not err in overruling Cornell's *Batson* challenge and there was no violation of Cornell's equal protection rights under the Fourteenth Amendment.

# II. Hearsay

[22] Next, Cornell argues that the trial court erroneously admitted inadmissible hearsay testimony. Specifically, he claims that the trial court erred by allowing the State to introduce out-of-court statements made by Denyae to Detective King through the testimony of Detective King, and by then allowing the

statements to be used as substantive evidence rather than solely for impeachment purposes.

[23] The admission or exclusion of evidence is within the trial court's sound discretion and is afforded considerable deference on appeal. *E.g.*, *Nicholson v. State*, 963 N.E.2d 1096, 1099 (Ind. 2012). We may reverse a trial court's ruling on the admissibility of evidence only when the ruling is clearly against the logic and effect of the facts and circumstances or if the trial court has misinterpreted the law. *Id.*

[24] "Hearsay is an out-of-court statement offered in court to prove the truth of the matter asserted." *Turner v. State*, 953 N.E.2d 1039, 1055 (Ind. 2011); Ind. Evidence Rule 801(c). Hearsay is generally inadmissible, subject to a handful of specific and limited exceptions. However, hearsay that is otherwise inadmissible may become admissible "where the defendant 'opens the door' to questioning on that evidence." *Turner*, 953 N.E.2d at 1055 (quoting *Kubsch v. State*, 784 N.E.2d 905, 919 n.6 (Ind. 2003)). To "open the door," the evidence relied upon "must leave the trier of fact with a false or misleading impression of the facts related." *Id.* at 1056 (quoting *Ortiz v. State*, 741 N.E.2d 1203, 1208 (Ind. 2001)).

[25] At trial, Detective King testified on direct examination, as a witness for the State, that he had interviewed the juveniles involved in this case, including Cornell and Denyae. The State played the recorded interview of Cornell and asked no further questions. On cross-examination, Cornell asked Detective

King about statements Denyae made to him during the interview conducted on July 18, 2018, and about statements Detective King overheard Denyae making to his father, as well as about a second set of statements Denyae made to Detective King the next day on July 19:

> CORNELL: . . . Now, I believe among the statements you took you took a statement, actually two different statements from Denyae Burris, is that correct?
>
> DETECTIVE KING: I did.
>
> CORNELL: And the first one, my understanding on July 18 you and Detective Lowe took a statement from Mr. Burris. Is that your understanding?
>
> DETECTIVE KING: Yes.
>
> CORNELL: And that was videotaped?
>
> DETECTIVE KING: Yes.
>
> CORNELL: And I believe that previously he had implicated Paris somewhat, did he not?
>
> DETECTIVE KING: Yes.
>
> CORNELL: And then there was a break and Denyae was talking to his father, correct?
>
> DETECTIVE KING: Correct.

CORNELL: And I believe you overheard that, correct?

DETECTIVE KING: I did.

CORNELL: And it's my understanding what you overheard him saying was that he told his father that the gun was Jahkei's. He had told you originally Paris had it, right?

DETECTIVE KING: He told me the gun belonged to Jahkei.

CORNELL: Right, he told his dad and you overheard it, it was Jahkei's gun?

DETECTIVE KING: Correct.

CORNELL: And he said that Paris did not leave with the gun from the porch, correct?

DETECTIVE KING: That is correct.

CORNELL: And he said Jahkei had the gun, brought it inside the house that morning, and when Jahkei left before 8 a.m., he took the gun with him?

DETECTIVE KING: That is correct.

CORNELL: And all that he's telling his dad, he's not telling you, is he?

DETECTIVE KING: Right.

CORNELL: And then I believe you took a second statement the next day, did you not, July 19?

DETECTIVE KING: From Denyae?

CORNELL: Yes, from Denyae Burris.

DETECTIVE KING: I believe that was at his residence, but yes. . . . Is that the one you're referring to?

CORNELL: Yeah, it may have been, it was the following day, was it not?

DETECTIVE KING: Yes.

CORNELL: And did he not tell you then that he admitted to lying about the gun so as not to get Jahkei into trouble?

DETECTIVE KING: Jahkei, correct.

CORNELL: He told you he lied about the gun to protect Jahkei?

DETECTIVE KING: Correct.

CORNELL: He said it was actually Jahkei's gun and that Jahkei had the gun both before and when he arrived at the gas station, correct?

DETECTIVE KING: Yes.

Tr. Vol. III p. 150-52.

[26] On redirect examination, the State asked Detective King about Denyae's second statement referenced by Cornell's questioning during cross-examination and asked if Denyae made any more statements therein about Paris's involvement. At this point, Cornell objected, requesting that the jury be admonished that anything in Denyae's statements be used solely for impeachment evidence and not as substantive evidence. The trial court overruled, concluding that Cornell had opened the door by asking the questions about Denyae's statements, that the State could ask any additional clarifying questions, and that the evidence would be allowed for any purpose, substantive or otherwise. Detective King's testimony responding to the question about Cornell's involvement was therefore admitted as substantive evidence:

> THE STATE: Detective King . . . in that second statement [about the gun] did Denyae Burris make any statements about Paris Cornell's involvement?
>
> DETECTIVE KING: He did. When Denyae said that he had lied to protect Jahkei and said it was actually Jahkei's gun, what I didn't say earlier was Denyae told us that Jahkei while at the gas station had given the gun to Paris and when they went around the corner of the building that Paris actually had the gun. When they went, after the shooting they went back to Denyae's house, Denyae said that was when Paris gave the gun back to Jahkei since it was Jahkei's gun.
>
> THE STATE: And that's what Denyae Burris stated to you in that second interview?
>
> DETECTIVE KING: Correct.

Tr. Vol. III p. 155. On re-redirect examination, the State elicited the following additional testimony from Detective King:

> THE STATE: Over the course of both statements that Denyae Burris made to you . . . did his story change at all as to who fired the shot?
>
> DETECTIVE KING: It did not.
>
> THE STATE: And, according to Denaye [sic] Burris, who fired the shot?
>
> DETECTIVE KING: Paris Cornell.

*Id.* at 157.

[27] Cornell argues that the testimony elicited by the State regarding Denyae's statements to Detective King are "classic" hearsay statements, appellant's br. p. 20, and that because they do not fall under any of the exceptions to the rule against hearsay, they were improperly admitted as substantive evidence.

[28] We do not disagree with Cornell—nor does the State—that the challenged statements are hearsay: they were made out of court, were offered to prove the truth of the matter asserted (that is, who had the gun at what point in time), and do not meet any of the statutory hearsay exceptions. But regardless of their hearsay nature, these statements nonetheless became admissible once Cornell questioned Detective King about Denyae's statements and left the misleading impression that Jahkei had the gun the entire time he and Cornell were at

Sam's. Clarification was thus warranted, and the State's subsequent questioning about Denyae's second statement to Detective King made it clearer that Cornell had the gun when the shot was fired. *See, e.g.*, *Turner*, 953 N.E.2d at 1055-56 ("Having thus opened the door during cross-examination of a supposed disagreement, Turner is in no position to complain of contrary evidence elicited by the State on redirect examination."); *Kubsch*, 784 N.E.2d at 919 n.6 (finding trial court properly admitted testimony that defendant kept a gun in his closet, where defense had opened the door by introducing statements through another witness that defendant neither possessed nor had access to a gun).

[29] We therefore find that Cornell effectively opened the door to further questioning on Denyae's statements and to their admission as substantive evidence, and that the trial court did not err in its ruling on their admissibility.

# III. Confrontation Clause

[30] In turn, Cornell argues that the admission of the hearsay evidence regarding Denyae's statements violated his rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution.[7]

[31] The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted

---

[7] Cornell concedes that he failed to preserve this issue by not objecting on this basis at trial, and that he thus must prove fundamental error for us to reach the merits of the issue. *E.g.*, *Brown v. State*, 929 N.E.2d 204, 206-07 (Ind. 2010) ("A claim that has been waived by a defendant's failure to raise a contemporaneous objection can be reviewed on appeal if the reviewing court determines that a fundamental error occurred.").

with the witnesses against him." In *Crawford v. Washington*, 541 U.S. 36 (2004), "the [U.S.] Supreme Court held that the Confrontation Clause . . . prohibits admission in a criminal trial of testimonial statements by a person who is absent from trial, unless the person is unavailable and the defendant had a prior opportunity to cross-examine the person." *Fowler v. State*, 829 N.E.2d 459, 464 (Ind. 2005). The United States Supreme Court later delineated when a statement is considered "testimonial" or not under this prohibition:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis v. Washington*, 547 U.S. 813, 822 (2006).

[32] In the instant case, we need not even reach the question of whether Denyae's out-of-court statements were testimonial because he was available and subject to cross-examination at trial. "[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements. . . . The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it." *Crawford*, 541 U.S. at 59 n.9.

[33] Cornell argues that, despite Denyae taking the stand as a witness for the State at trial, he was nonetheless unavailable for Confrontation Clause purposes because he claimed to not remember the details surrounding the shooting, answering the majority of questions posed at trial with some variation of "I forgot" or "I don't remember." *See* Tr. Vol. II p. 148-51, 154-68. But our Supreme Court has clarified that such testimony and claimed losses of memory at trial have no effect on availability for purposes of the Confrontation Clause:

> Although some courts and commentators contended that a witness who asserts an inability to recall any significant information is for all practical purposes unavailable for confrontation, this issue was settled in *United States v. Owens*, 484 U.S. 554, 558, 108 S. Ct. 838, 98 L.E.2d 951 (1988). In *Owens*, the Supreme Court . . . held that as long as the declarant testifies the Confrontation Clause has been satisfied even if the declarant is unable to recall the events in question. *Id.* at 558, 108 S. Ct. 838. . . . The feigned or real absence of memory is itself a factor for the trier of fact to establish, but does not render the witness unavailable. Rather, as *Owens* explained, it is a factor for the trier fo fact to consider in evaluating the witness's current and earlier versions. *Id.* at 559, 108 S. Ct. 838. . . . We conclude that a witness who is present and responds willingly to questions is "available for cross-examination" as that term is used in *Crawford* discussing the Confrontation Clause, just as *Owens* observed that such a witness is "subject to cross-examination" under the common understanding of that phrase. We believe no significance attaches to these slightly different verbal formulations.

*Fowler*, 829 N.E.2d at 466 (internal footnote omitted).

[34] As such, we find no Confrontation Clause violation here. Denyae was available as a witness and testified at trial; Cornell even admitted at trial that he "ha[d] the opportunity to cross examine" Denyae. Tr. Vol. II p. 158. Rather than refusing to answer the questions posed to him, Denyae merely answered—willingly—that he did not remember or know the details, but this does not render him unavailable for purposes of the Confrontation Clause. Cornell's Sixth Amendment rights, therefore, were not violated by the admission of Denyae's hearsay statements.

## IV. Sentence Appropriateness

[35] Lastly, Cornell argues that the sixty-two-year sentence imposed by the trial court is inappropriate in light of the nature of the offenses and his character. Indiana Appellate Rule 7(B) provides that this Court may revise a statutorily authorized sentence "if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." In conducting this review, "substantial deference" must be given to the trial court's decision, "since the 'principal role of [our] review is to attempt to leaven the outliers,' and not to achieve a perceived 'correct' sentence." *Knapp v. State*, 9 N.E.3d 1274, 1292 (Ind. 2014) (quoting *Chambers v. State*, 989 N.E.2d 1257, 1259 (Ind. 2013)) (internal citations omitted).

[36] For felony murder, Cornell faced a term of forty-five to sixty-five years, with an advisory term of fifty-five years. I.C. § 35-50-2-3. For Level 3 felony conspiracy

to commit armed robbery, Cornell faced a term of three to sixteen years, with an advisory term of nine years. For the firearm enhancement, Cornell faced an additional five to twenty years. I.C. § 35-50-2-11(g). The trial court imposed a fifty-two-year term for the murder conviction and a seven-year term for the conspiracy to commit armed robbery conviction, to be served concurrently. The trial court then enhanced the murder sentence by ten years under the firearm enhancement, for a total sentence of sixty-two years imprisonment.

[37] With respect to the nature of the offense, we note that Cornell shot and killed Kevin in an attempt to steal approximately twenty dollars after leading him around the side of the building, where there were no security cameras and they were hidden from view, under the guise of selling him marijuana. Cornell also attempted to cover up the crime by having others help him dispose of the gun in the Ohio River.

[38] Cornell's main argument regarding the nature of the offense is that his crime was neither brutal nor drawn out, relying primarily on *Conley v. State*, 972 N.E.2d 864 (Ind. 2012), to distinguish his case from those deserving of higher sentences. In *Conley*, the seventeen-year-old defendant murdered his ten-year-old brother while babysitting him, choking him multiple times over a prolonged period of time, and finally placing a bag over his head, causing him to die of asphyxiation. Afterwards, Conley dragged the body down stairs, slamming the head on the concrete to "ensure [he] was dead." *Id.* at 876. Our Supreme Court in *Conley* found that the sentence of life without parole was not inappropriate,

relying in part on the fact that the victim "suffered unimaginable horror," in contrast to a "nearly instantaneous death by a bullet." *Id.*

[39] We have no trouble agreeing that the nature of the offense committed by Cornell pales in comparison to the drawn-out, horrific suffering seen in a case like *Conley*. But the trial court accounted for such differences when it imposed sentences that were not only below the maximum terms, but below the advisory terms as well, and further ordered that they be served concurrently rather than consecutively. We do not believe the nature of the offenses in this case renders the sentence inappropriate.

[40] With respect to Cornell's character, Cornell has a history of juvenile delinquency adjudications, including resisting law enforcement, disorderly conduct, trespass, possession of a stolen firearm, violating curfew, and burglary. *See, e.g.*, *Reis v. State*, 88 N.E.3d 1099, 1105 (Ind. 2017) ("Even a minor criminal record reflects poorly on a defendant's character."). Given that Cornell was only fifteen years old at the time of the present offense, this history suggests a concerning pattern for someone so young, and further demonstrates that, despite his repeated interactions with the system, he has made no effective attempt to modify and improve his behavior.

[41] Despite Cornell's urges to find the sentence inappropriate based on his young age, we unfortunately find no basis in prior caselaw for doing so. The United States Supreme Court has concluded on multiple occasions that "[b]ecause juveniles have diminished culpability and greater prospects for reform . . . 'they

are less deserving of the most severe punishments.'" *Miller v. Alabama*, 567 U.S. 460, 471 (2012) (quoting *Graham v. Florida*, 560 U.S. 48, 68 (2010)). Here, we are not dealing with the most severe crime, but neither are we dealing with the most severe punishment, which Cornell even acknowledges—"to be sure, this is not a life without parole or death penalty case." Appellant's Br. p. 32-33. And in Indiana, our Court and our Supreme Court have found sentences similar to Cornell's to be appropriate despite the defendant's youth. *See, e.g.*, *Legg v. State*, 22 N.E.3d 763, 767 (Ind. Ct. App. 2014) (upholding advisory fifty-five-year sentence for a sixteen-year-old tried as an adult and convicted of murder); *Villalon v. State*, 956 N.E.2d 697, 709 (Ind. Ct. App. 2011) (finding sixty-year sentence imposed on fifteen-year-old defendant not inappropriate); *see also Taylor v. State*, 86 N.E.3d 157 (Ind. 2017) (reducing a seventeen-year-old defendant's sentence for murder from life without parole to eighty years—the maximum term of years plus a fifteen-year enhancement for using a firearm).

[42] We find that the sentence imposed by the trial court was not inappropriate in light of the nature of the offenses and Cornell's character.

[43] The judgment of the trial court is affirmed.


Riley, J., and Brown, J., concur.